DECISION
{¶ 1} Relator, Linda S. Keith ("relator"), filed this original action seeking issuance of a writ of mandamus directing respondent, Industrial Commission of Ohio *Page 2 
("commission"), to vacate orders: (1) denying her request for a neurosurgical consultation, and (2) granting her employer's motion to terminate temporary total disability ("TTD") compensation based on the finding that her industrial injury has reached maximum medical improvement.
 {¶ 2} We referred this matter to a magistrate pursuant to Rule 12(M) of this court and Civ.R. 53. The magistrate issued a decision dated April 30, 2007. In that decision, the magistrate concluded that relator is not entitled to the requested writ. Relator filed objections to the magistrate's decision. For the reasons that follow, we overrule relator's objections and adopt the magistrate's decision.
 {¶ 3} On November 15, 2005, relator suffered an industrial injury while employed by respondent, Dillen Products, Inc. ("employer"). Relator filed a First Report of Injury, Occupational Disease or Death ("FROI-1") form on December 21, 2005. On the form, her treating physician, E. Lee Foster, D.O., certified as diagnoses related to the industrial injury acute low back strain, herniated nucleus pulposus, contusion coccyx, and compression fracture. After a subsequent office visit, Dr. Foster completed a C-84 form. On the form, Dr. Foster certified TTD from the date of injury to an estimated date of return to work of June 6, 2006.
 {¶ 4} On February 15, 2006, at the employer's request, Matthew D. McDaniel, M.D., examined relator. Dr. McDaniel's report indicated that lumbar x-rays showed degenerative changes at L4-5 and L5-S1. The report also discussed relator's history of back pain and injury, stating that she had been diagnosed with two small herniated discs after a lifting injury suffered in the mid-1990s. The report also indicated that relator had a long history of scoliosis. Dr. McDaniel concluded that relator's current diagnoses were *Page 3 
acute lumbosacral sprain and coccygeal contusion. Dr. McDaniel's report also stated that there was no evidence of a compression fracture and that, although there was some indication of a disc injury, this could not be confirmed by diagnostic studies.
 {¶ 5} Based on his examination, Dr. McDaniel concluded that relator could not return to her former position, but could perform work with appropriate restrictions. The report also concluded that relator had not reached maximum medical improvement. Dr. McDaniel reached no conclusion regarding the time for recovery or a date for return to work, stating that these issues should be addressed after completion of a lumbosacral MRI.
 {¶ 6} The employer had initially refused to certify the claim. Following a March 2, 2006 hearing, a district hearing officer ("DHO") issued an order allowing the claim for lumbosacral sprain and coccygeal contusion because the employer accepted allowance of those conditions based on Dr. McDaniel's report. The DHO denied relator's request for TTD compensation. After an April 18, 2006 hearing, a staff hearing officer ("SHO") modified the DHO order to award TTD compensation from the date of the injury through the date of the hearing. The employer's appeal of the SHO order was denied.
 {¶ 7} On March 29, 2006, a lumbar MRI was conducted at Dr. Foster's request. Charles Boetsch, M.D., interpreted the MRI in a report dated March 30, 2006. Dr. Boetsch's report concluded that the MRI indicated some degenerative joint disease, and some interspace narrowing at L4-5 and L5-S1.
 {¶ 8} On April 4, 2006, Dr. Foster completed a C-9 requesting authorization for a neurosurgical consultation, which the employer denied. The employer then requested a medical records review, which was conducted by Dean W. Erickson, M.D. Dr. Erickson's *Page 4 
report on the medical records review does not include Dr. Boetsch's interpretation of the March 29, 2006 MRI as one of the documents included in the review, but does make reference to the MRI findings. Dr. Erickson concluded that the requested neurosurgical consultation would not be reasonable and appropriate with respect to the two conditions allowed in the claim. In reaching this conclusion, Dr. Erickson stated that it was impossible to determine from Dr. Foster's evaluation whether or not there were any objective findings that would warrant a neurosurgical evaluation. (R. at 26.) Dr. Erickson's report also cited Dr. McDaniel's conclusion that there were no focal neurologic deficits. Dr. Erickson based his conclusion on relator's history of back pain, which he said showed a pre-existing condition that would be expected to cause ongoing lumbar spine complaints.
 {¶ 9} Dr. Erickson's report also included a discussion of relator's foraminal stenosis. Dr. Erickson noted that the request for neurosurgical consultation came shortly after the MRI showed foraminal stenosis. Thus, Dr. Erickson stated that "it would appear that Dr. Foster is concerned regarding the foraminal stenosis * * * The foraminal stenosis is clearly unrelated to the allowed conditions of the claim and the mechanism of injury of November 15, 2005." (R. at 27.) Consequently, Dr. Erickson concluded that the requested neurosurgical consultation was not indicated. Dr. Erickson further stated that the allowed conditions were limited to soft tissue injuries that would have gone through the healing process in "a matter of weeks to a couple of months." (R. at 27.)
 {¶ 10} Dr. Erickson subsequently conducted an independent medical examination of relator, at the employer's request, and prepared a report in which he concluded that relator was capable of returning to her position of employment with respect to the allowed *Page 5 
conditions. Dr. Erickson also specifically concluded that relator's ongoing pain was related to pre-existing conditions unrelated to the claim, and that relator reached maximum medical improvement on her allowed conditions on or about February 15, 2006. (R. at 35.)
 {¶ 11} The employer moved to terminate TTD based on the finding of maximum medical improvement. After a hearing on June 14, 2006, a DHO granted relator's request for a neurosurgical consultation, and denied the employer's motion to terminate TTD. After a hearing on August 6, 2006, an SHO issued an order that reversed the DHO's finding. Relator's administrative appeal of the SHO's finding was denied, and relator then filed this action.
 {¶ 12} In order to establish the right to a writ of mandamus, relator must show that the commission abused its discretion by entering an order that is not supported by any evidence in the record. State ex rel.Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76, 26 OBR 66,497 N.E.2d 70. Where the record shows "some evidence" supporting the commission's findings, there is no abuse of discretion, and mandamus is not appropriate. State ex rel. Lewis v. Diamond Foundry Co. (1987),29 Ohio St.3d 56, 29 OBR 438, 505 N.E.2d 962.
 {¶ 13} In considering requests for authorization of medical services, the courts have recognized a three part test: (1) whether the requested services reasonably related to the allowed conditions; (2) whether the services are necessary for treatment of the industrial injury; and (3) whether the cost of the requested services is medically reasonable. State ex rel. Jackson Tube Servs. v. Indus. Comm.,99 Ohio St.3d 1, 2003-Ohio-2259, *Page 6 788 N.E.2d 625, citing State ex rel. Miller v. Indus.Comm., 71 Ohio St.3d 229, 1994-Ohio-204, 643 N.E.2d 113.
 {¶ 14} Relator argues in her objections that the magistrate incorrectly concluded that the evidence in the record did not establish that the requested neurosurgical consultation was reasonably related to her allowed conditions. Relator argues that Dr. McDaniel's report supports the conclusion that her pre-existing scoliosis was not the cause of the problems she was experiencing, and that Dr. Foster's request for the neurosurgical consultation shows the need to conduct further testing to determine whether her claim should have additional conditions allowed.
 {¶ 15} However, the record here includes Dr. Erickson's unequivocal conclusion that the neurosurgical consultation related to conditions other than those allowed in the claim. Thus, there was some evidence in the record supporting the conclusion that the neurosurgical consultation was not reasonably related to the allowed conditions. The commission has the discretion to assess conflicting medical evidence and determine the weight and credibility to be given to the various medical opinions.State ex rel. Ritchey v. Indus. Comm., Franklin App. No. 03AP-601,2004-Ohio-2712.
 {¶ 16} Relator's objections to the magistrate's decision do not specifically take issue with the magistrate's conclusion that the commission did not abuse its discretion by terminating TTD. Dr. Erickson's report specifically stated that relator had reached maximum medical improvement. Thus, there was some evidence in the record to support the commission's decision terminating TTD.
 {¶ 17} Consequently, because the magistrate correctly concluded that there was some evidence in the record supporting the commission's decisions denying relator's *Page 7 
request for a neurosurgical consultation and terminating TTD, we overrule relator's objections to the magistrate's decision and adopt the magistrate's decision denying relator's request for a writ of mandamus.
Objections overruled; writ of mandamus denied.
TYACK and WHITESIDE, JJ., concur.
WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 8 
 APPENDIX A MAGISTRATE'S DECISION Rendered on April 30, 2007 IN MANDAMUS {¶ 18} In this original action, relator, Linda S. Keith, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order *Page 9 
that denies relator's request for a neurosurgical consultation and grants the employer's motion to terminate temporary total disability ("TTD") compensation[1] based upon a finding that the industrial injury has reached maximum medical improvement ("MMI"), and to enter an order that grants the request for a neurosurgical consultation and denies the employer's motion to terminate TTD compensation.
Findings of Fact: {¶ 19} 1. On December 21, 2005, relator filed an application for workers' compensation benefits on a form captioned "First Report of an Injury, Occupational Disease or Death" ("FROI-1"). On the FROI-1, relator alleged that she sustained an industrial injury on November 15, 2005, while employed as a "packer" for respondent Dillen Products, Inc., a self-insured employer under Ohio's workers' compensation laws. The employer refused to certify the industrial claim which is assigned claim number 05-888801.
 {¶ 20} 2. On the FROI-1, relator's treating physician, E. Lee Foster, D.O., listed the following diagnoses as related to the industrial injury: "Acute low Back strain 846.9[;] HNP [herniated nucleus pulposus] 722.10[;] Contusion Coccyx 724.79[;] Compression Fx. [fracture] 808.43." Dr. Foster certified these diagnoses on November 22, 2005, on the FROI-1.
 {¶ 21} 3. On January 5, 2006, relator returned to Dr. Foster's office. The office visit and examination prompted Dr. Foster to record relator's subjective complaints and his objective findings in an office note which is contained in the stipulated record filed in this action. The office visit also prompted Dr. Foster to complete a C-84 dated *Page 10 
January 9, 2006, on which he certified TTD from November 15, 2005 to an estimated return-to-work date of June 6, 2006.
 {¶ 22} 4. On February 15, 2006, at the employer's request, relator was examined by Matthew D. McDaniel, M.D., who issued a three-page narrative report, which states:
 History: Ms. Keith was injured on 11/15/05 while working as a packer. She had stepped up to tape a stack of flower flats when she lost her balance and fell backwards. She remembers landing on her low back on a concrete floor. She stated she had the immediate onset of low back pain with feelings of numbness in her legs. She was assisted to her feet by coworkers and continued her shift.
 Ms. Keith was scheduled off for the next two days and she applied heat to her back. She worked her next scheduled day, but the day after that she stated she left the employer due to back pain.
 Ms. Keith began medical care with her family physician. Lumbar x-rays indicated degenerative changes at L4-5 and L5-S1. She continued care with medications.
 Ms. Keith stated that her family physician initially released her to light duty work but she has not returned to the employer of record.
 Review of the medical documentation indicated concerns for an acute low back strain, herniated nucleus pulposus, coccygeal contusion, and compression fracture. A lumbo-sacral MRI has been requested.
 Of note is a past history of low back pain and injury. Ms. Keith indicated that she has a long history of scoliosis. She stated she sustained a lifting injury in the mid 1990's and was diagnosed with two small herniated discs by MRI. She stated she was treated for approximately two weeks and recovered. Ms. Keith indicated that her last treatment for back pain was approximately five years ago after lifting an object at home. She was treated with osteopathic manipulation therapy by her family physician and recovered. *Page 11 
 * * *
 Physical Examination: Ms. Keith was a very pleasant 50-year-old lady in no acute distress. She stood 5'6" tall and weighed 260 pounds. She had difficulty arising from the seated position and ambulated with an antalgic gait. She had difficulty replacing her shoes and socks.
 Examination of the lumbar spine indicated lumbosacral paraspinal muscle spasm and guarding. There was minimal midline vertebral tenderness. Lumbar range of motion was reduced and painful in all planes. Lower extremity strength was 5/5 in all muscle groups. Patellar and Achilles reflexes were 2/4 bilaterally. Straight leg raise testing was positive on the left with reproduction of pain and numbness into the heel of the left foot. The lumbar spine had a mild scoliotic curve. The sacrococcygeal area had minimal tenderness. There was no coccygeal brusing, deformity or subluxation to palpation.
 Conclusions: To specifically address your questions:
 Ms. Keith's current diagnoses are acute lumbosacral sprain and coccygeal contusion. There is no evidence of a compression fracture by lumbar x-ray. There is a clinical suggestion of a disc injury, manifest by the left leg complaints and positive straight leg raise test, but not confirmed by diagnostic studies.
 Based on the job description provided by Ms. Keith, she would not be able to return to her former position of employment as a packer due to the lifting, bending and climbing requirements. She would, however, be able to work with the appropriate restrictions.
 Ms. Keith is not at maximum medical improvement for the diagnoses clarified and sustained on 11/15/05. She has continued objective findings consistent with the clarified diagnoses, specifically the lumbosacral sprain injury.
 Treatment recommendations would include a diagnostic lumbosacral MRI, the addition of a skeletal muscle relaxant to be used as-needed at bedtime, and an instruction in a home exercise program focusing on lumbosacral stretching exercises. *Page 12 
 I am unable to speculate at this time on a time of recovery or return to full duty work. These issues should be readdressed after completion of the lumbosacral MRI.
 Ms. Keith's pre-existing scoliosis is, in my opinion, unlikely to be causing or contributing to the current complaints. Her scoliosis is relatively mild in degree. There is no evidence that the scoliosis has required ongoing care prior to the industrial event of 11/15/05.
 {¶ 23} 5. Following a March 2, 2006 hearing, a district hearing officer ("DHO") issued an order allowing the claim for "lumbosacral sprain and coccygeal contusion" given that the employer's representative advised at the hearing that the employer accepts the claim for those conditions. Apparently, the employer's acceptance of those conditions was premised upon Dr. McDaniel's report.
 {¶ 24} The DHO's order denied the request for TTD compensation beginning November 15, 2005.
 {¶ 25} 6. Relator administratively appealed the DHO's order of March 2, 2006.
 {¶ 26} 7. On March 29, 2006, relator underwent an MRI of the lumbar spine which had been authorized by the employer at the request of relator's treating physician, Dr. Foster.
 {¶ 27} 8. The MRI was interpreted by Charles Boetsch, M.D., on March 30, 2006. Dr. Boetsch wrote:
 * * * There is generalized moderate [degenerative joint disease].
 * * *
 At L4-L5, there is interspace narrowing the [sic]. The foramina are mildly narrow. No significant narrowing of the spinal canal is present. There is only slight disc bulge. *Page 13 
 At L5-S1, the interspace is narrowed. Bilateral neural foraminal narrowing is noted. Please correlate with the nature of any radiculopathy. There is no significant central stenosis.
 IMPRESSION: [Degenerative joint disease.] Interspace narrowing at the lowest 2 levels.
 {¶ 28} 9. Following an April 18, 2006 hearing, a staff hearing officer ("SHO") issued an order stating that the DHO's order of March 2, 2006, was being modified. The SHO allowed the claim for "lumbosacral sprain/strain; coccygeal contusion," and awarded TTD compensation from November 21, 2005 through the date of the hearing. The SHO's order explains:
 * * * The Staff Hearing Officer finds that there is sufficient medical evidence to establish by a preponderance that the allowed conditions in this claim independently precluded the claimant from returning to her position of employment as a "packer" with this employer of record. This finding is based upon the C-84 reports of Dr. Foster in file, as well as, the independent medical examination report of Dr. Matthew McDaniel, M.D., dated 2/15/2006. Therein, Dr. McDaniel opines that the allowed conditions prevent the claimant from returning to employment as a packer. Dr. McDaniel further opines that the allowed conditions in this claim have not yet reached maximum medical improvement. This evidence is found to be persuasive with respect to this extent of disability issue.
 {¶ 29} 10. On May 12, 2006, another SHO mailed an order refusing the employer's administrative appeal from the SHO's order of April 18, 2006.
 {¶ 30} 11. Earlier, on April 4, 2006, Dr. Foster completed a C-9 on which he requested authorization for a "neurosurgical consult." On April 12, 2006, the employer denied the C-9. *Page 14 
 {¶ 31} 12. Relator's request for a neurosurgical consultation prompted the employer to request a medical records review from Dean W. Erickson, M.D. On April 17, 2006, Dr. Erickson issued a five-page report.
 {¶ 32} On the first page of his report, Dr. Erickson lists all the medical records he reviewed. The March 30, 2006 MRI interpretation by Dr. Boetsch is not among the medical records identified for his review.
 {¶ 33} Beginning at page three of his report, Dr. Erickson opines:
 An MRI scan was obtained, which as per indirect report showed foraminal stenosis based on Dr. Foster's April 3, 2006 note. The following day in a C9, he requested a neurosurgical consult.
 Based upon a review of the facts set forth in the medical records as well as the current history and physical examination, and accepting the examination findings in the medical record, I would offer the following opinions to a reasonable degree of medical certainty.
 1) Please render an opinion as to whether the requested neurosurgical consultation is reasonable and/or necessary and/or related to the allowed conditions in this claim (lumbo-sacral sprain and coccygeal contusion).
 The request for neurosurgical consultation is not reasonable and appropriate with respect to the allowed conditions of the claim, which are limited to lumbosacral sprain, coccygeal contusion. The basis for this opinion is as follows:
 • Ms. Keith's examinations by Dr. Foster have not been complete. It is not possible to ascertain from Dr. Foster's evaluations as to whether or not Ms. Keith has any significant neurologic symptoms and/or objective findings that would warrant neurosurgical evaluation.
 • The one comprehensive objective evaluation documented in the medical record is that performed by Dr. Matthew McDaniel on February 15, 2006. That evaluation revealed no focal neurologic deficits. Straight leg raising was noted to be positive on the left. *Page 15 
 • Ms. Keith clearly has a history of preexisting chronic lumbar spine conditions. This appears to be related to her developmental scoliosis, which results in significant and ongoing chronic mechanical back pain. Ms. Keith also reported to Dr. McDaniel two prior back injuries including a lifting injury in the 1990s wherein she was diagnosed with two small herniated discs. Approximately five years ago, she had a second lifting injury at home. This history of recurrent lumbar spine pain as well as the developmental abnormality of scoliosis, as well as her massive obesity, would indicate that Ms. Keith has a significant preexisting condition involving the lumbar spine that would be expected to continue to cause her ongoing lumbar spine complaints.
 • Ms. Keith also has evidence of preexisting degenerative disc disease and arthritis at L4-5 and L5-S1 as noted on the x-rays obtained six days after this injury date. These x-ray findings are long standing in nature and relate to Ms. Keith's chronic preexisting relapsing lumbar spine pain.
 • Ms. Keith has recently been diagnosed with lumbar foraminal stenosis. Foraminal stenosis is narrowing of the bony outlets in the spine that allow the nerve roots to pass through from the spinal cord into the extremity. Individuals that have scoliosis will develop associated narrowing in the neural foramina (i.e. foraminal stenosis) merely due to the curvatures of the spine itself. In that the spine curves, naturally there will be narrowing in the foramina on the concave side of the spine that will result in foraminal stenosis. In addition, it is also noted that Ms. Keith has preexisting degenerative disc disease and degenerative arthritis, which contribute to foraminal stenosis. In that there is now a C9 request for neurosurgical consultation immediately after receiving the results of the MRI scan, it would appear that Dr. Foster is concerned regarding the foraminal stenosis, and requested a neurosurgical consultation. The foraminal stenosis is clearly unrelated to the allowed conditions of the claim and the mechanism of injury of November 15, 2005. Therefore, the neurosurgical consultation to evaluate the new diagnosis of foraminal stenosis is not indicated.
 • Ms. Keith['s] allowed conditions are limited to soft tissue injuries of lumbosacral sprain and coccygeal contusion. These are soft tissue injures which go through the normal *Page 16 
healing process over a matter of weeks to a couple of months. Ms. Keith's allowed conditions have long since resolved. Ms. Keith's treatment including need for further evaluation by a neurosurgeon is based on nonallowed conditions.
 {¶ 34} 13. On May 8, 2006, citing Dr. Erickson's April 17, 2006 report, the employer moved that the commission deny relator's C-9 request for a neurosurgical consultation and that the commission terminate TTD compensation.
 {¶ 35} 14. On June 6, 2006, at the employer's request, relator was examined by Dr. Erickson who issued a seven-page report. On the first page of his report, Dr. Erickson lists all the documents he reviewed. The interpretive report of the March 29, 2006 MRI is among the documents listed. Dr. Erickson's report states:
 An MRI scan was obtained on March 29, 2006 at Forum Health Elm Road Medical Imaging, which showed facet arthritis at L2-3 and L3-4. At L4-5 and L5-S1, there was evidence of degenerative disc disease with foraminal narrowing. Ms. Keith followed up with Dr. Foster on April 3, 2006, at which time diagnosed acute low back strain and coccyx contusion and recommended a neurological consultation. This was submitted in a C9 the following day, April 4, 2006.
 Ms. Keith states she has not yet seen a neurosurgeon. * * *
 * * *
 CONCLUSIONS
 In conclusion, Linda Keith has the allowed condition of "lumbosacral sprain and coccygeal contusion". Her current conditions are as follows:
 • Lumbosacral sprain resolved
 • Coccygeal contusion resolved *Page 17 
 • Chronic lumbar spine pain secondary to mechanical back pain from degenerative arthritis and moderate thoracolumbar scoliosis
 • Chronic lumbar spine pain with left referred leg pain secondary to foraminal stenosis from a combination of degenerative disc disease and degenerative arthritis
 • Moderate symptom magnification
 • Morbid obesity and physical deconditioning
 Based upon a review of the facts set forth in the medical records as well as the current history and physical examination, and accepting the examination findings in the medical record, I would offer the following opinions to a reasonable degree of medical certainty.
 1) Please provide your opinion as to whether the allowed conditions prevent Ms. Keith from returning to her former position of employment.
 Ms. Keith is fully capable of returning to her former position of employment as a packer with respect to the allowed conditions of the claim including lumbosacral sprain, coccy-geal contusion. The basis for this opinion is as follows:
 • Ms. Keith's allowed conditions are limited to soft tissue injuries, which after 6-1/2 months have long since gone through the normal healing process
 • Ms. Keith's ongoing chronic lumbar spine pain is related to preexisting postural and degenerative conditions unrelated to this claim
 2) Please provide your opinion on the issue of maximal medical improvement.
 In that Ms. Keith's allowed conditions have stabilized, and in that no further fundamental functional or physiologic improvement is to be anticipated despite further treatment and/or rehabilitation, she has reached maximal [sic] medical improvement. It is estimated, consistent with standard guidelines such as Millimen and Robertson, ODG and ACOEM, that she reached maximal medical improvement at three months on or about February 15, 2006. *Page 18 
 {¶ 36} 15. Following a June 14, 2006 hearing, a DHO issued an order granting relator's request for a neurosurgical consultation and denying the employer's May 8, 2006 motion to terminate TTD compensation.
 {¶ 37} 16. The employer administratively appealed the DHO's order of June 14, 2006.
 {¶ 38} 17. Following an August 3, 2006 hearing, an SHO issued an order stating:
 It is the finding of the Staff Hearing Officer authorization for further medical treatment consisting of a neurological consultation as requested is hereby specifically denied as the weight of the medical evidence on file indicates that said consult is not medically indicated in the treatment of the allowed conditions for which this claim is currently recognized.
 This portion of said order is based upon the narrative report dated 4/17/2006 and 6/6/2006 from Dr. Erickson (employer's physician).
 The Employer's remaining Motion filed 5/8/2006 is granted to the extent of this order.
 It is the finding of the Staff Hearing Officer that based upon the report dated 4/17/2006 and 6/6/[2]006 from Dr. Erickson (employer's physician) that the Injured Worker's condition has reached maximum medical improvement pursuant to a medical examination he performed on the Injured Worker on 6/6/2006. The Staff
 Hearing Officer further finds that as a result of said finding of maximum medical improvement, the Injured Worker's temporary total compensation shall be and is hereby terminated as of 8/3/2006, the date of today's hearing.
 Furthermore, based upon the finding of maximum medical improvement as well as the termination of the Injured Worker's temporary total compensation as indicated above, the Staff Hearing Officer also finds that any temporary total compensation paid subsequent to 8/3/2006, the date of said termination, is an overpayment and shall be recouped pursuant to Section 4123.511(J) of the Ohio Revised Code. *Page 19 
 This remaining portion of said order is based upon the narrative reports dated 4/17/2006 and 6/6/2006 from Dr. Erickson (employer's physician) indicating that the Injured Worker has reached maximum medical improvement, thus justifying the termination of temporary total compensation as of today's date.
 {¶ 39} 18. On August 17, 2006, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of August 3, 2006.
 {¶ 40} 19. On October 30, 2006, relator, Linda S. Keith, filed this mandamus action.
Conclusions of Law: {¶ 41} Two issues are presented: (1) whether the commission abused its discretion in denying relator's request for a neurosurgical consultation, and (2) whether the commission abused its discretion in terminating TTD compensation based upon a finding that the industrial injury had reached MMI.
 {¶ 42} Finding no abuse of discretion, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 43} The Supreme Court of Ohio has adopted a tripartite test for authorization of medical services: (1) Are the medical services reasonably related to the industrial injury, that is, the allowed conditions? (2) Are the services reasonably necessary for treatment of the industrial injury? (3) Is the cost of such service medically reasonable? State ex rel. Jackson Tube Services, Inc. v. Indus.Comm., 99 Ohio St.3d 1, 2003-Ohio-2259, at ¶ 23. *Page 20 
 {¶ 44} Here, the SHO's order of August 3, 2006 denies relator's request for a neurosurgical consultation,[1] based upon a finding that "said consult is not medically indicated in the treatment of the allowed conditions for which this claim is currently recognized." That finding is specifically premised upon the two reports from Dr. Erickson dated April 17 and June 6, 2006.
 {¶ 45} In his April 17, 2006 report, Dr. Erickson renders an opinion as to whether the requested neurosurgical consultation is "reasonable and/or necessary and/or related to the allowed conditions in this claim (lumbosacral sprain and coccygeal contusion)."
 {¶ 46} It should be noted that Dr. Erickson's April 17, 2006 report post-dates the March 29, 2006 MRI. Apparently, Dr. Erickson did not have Dr. Boetsch's March 30, 2006 interpretive report of the March 29, 2006 MRI when he wrote his April 17, 2006 report. However, Dr. Erickson did have Dr. Foster's April 3, 2006 note which, according to Dr. Erickson, indicates that the MRI scan showed "foraminal stenosis."
 {¶ 47} Analysis here begins with the observation that Dr. Foster, the physician who completed the C-9 request for a neurosurgical consultation, never explained in any document of record why he believed that a neurosurgical consultation was reasonably related to the industrial injury. Obviously, Dr. Foster could have supplemented his C-9 request with such an explanation but did not do so. Consequently, Dr. Erickson felt compelled to state that "it would appear" that Dr. Foster has requested the neurosurgical consultation because he is concerned about foraminal stenosis, a nonallowed condition. *Page 21 
 {¶ 48} Dr. Erickson then explains that the foraminal stenosis found by the MRI is unrelated to "the mechanism of injury." In short, Dr. Erickson opined that foraminal stenosis could not become an additional claim allowance because that condition is unrelated to the mechanism of injury.
 {¶ 49} It is certainly conceivable that a neurosurgical consultation could be deemed reasonably related to an industrial injury if such consultation were conducted for the purpose of determining the existence of other conditions that should be allowed in the claim. See JacksonTube (claimant could not know what conditions to seek additional allowance for without first getting the diagnosis that only surgery could provide). While relator seems to suggest that is the case here, clearly Dr. Foster himself made no such claim in any document of record.
 {¶ 50} At oral argument, relator's counsel asserted that the request for a neurosurgical consultation is supported by the February 15, 2006 report from Dr. McDaniel. Specifically, relator's counsel asserted that Dr. McDaniel's statement, "[t]here is a clinical suggestion of a disc injury," can be viewed as support for the request for a neurosurgical consultation. The magistrate disagrees.
 {¶ 51} While Dr. McDaniel recommended the MRI that was performed on March 29, 2006, he did not issue a report following the MRI. More importantly, Dr. McDaniel did not recommend that a neurosurgical consultation follow the MRI that he recommended in his February 15, 2006 report. Reliance upon Dr. McDaniel's report for the request for the neurosurgical consultation would require the commission to draw inferences from the report that are simply not there. *Page 22 
 {¶ 52} Here, relator asserts that she "has a right to a consult by a specialist to determine whether she is suffering from any other type of diagnosis." (Relator's brief at 6). To the extent that relator is asserting an automatic entitlement to a specialist consultation upon the asking, relator is clearly incorrect. Relator must show that the requested consultation is reasonably related to the industrial injury at least to the extent that there exists a reasonable probability that additional conditions of the claim might be determined and treated. Other than Dr. Foster's unexplained C-9 request for authorization of a neurosurgical consultation, there is no medical evidence in the record supporting the consultation request.
 {¶ 53} On the other hand, the commission had Dr. Erickson's April 17, 2006 opinion that the foraminal stenosis shown on the MRI cannot be related to the mechanism of the injury. Under the circumstances here, Dr. Erickson's report constitutes some evidence supporting the commission's denial of relator's request for a neurosurgical consultation.
 {¶ 54} The second issue, as previously noted, is whether the commission abused its discretion in terminating TTD compensation based upon the finding that the industrial injury had reached MMI.
 {¶ 55} In his June 6, 2006 report, upon which the commission relied, Dr. Erickson opined that relator has "reached maximal [sic] medical improvement." Apparently, relator's challenge to the commission's MMI finding hinges upon her claimed right to a neurosurgical consultation. Apparently, if relator were entitled to a neurosurgical consultation, she would argue that the commission's reliance upon Dr. Erickson's MMI opinion is premature. See State ex rel. Sellards v. Indus. Comm.,108 Ohio St.3d 306, *Page 23 2006-Ohio-1058, a cased cited by relator. Given that the commission's denial of a neurosurgical consultation must stand, relator has no real challenge to the commission's termination of TTD compensation.
 {¶ 56} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
KENNETH W. MACKE, MAGISTRATE
[1] The SHO's order mistakenly states that the request is for a "neurological" consultation. *Page 1